IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,
    *Plaintiff*,

v.

DWIGHT CARTER,
    *Defendant*.

Criminal No. ELH-18-17

**MEMORANDUM OPINION**

Dwight Carter, defendant, was convicted in 2018 of conspiracy to distribute heroin, for which he is serving a sentence of 120 months' imprisonment at FCI Cumberland, with credit dating to January 17, 2018. ECF 268; ECF 782. Carter submitted correspondence on July 14, 2020, construed as a motion for compassionate release. ECF 718. Thereafter, through appointed counsel, defendant filed a memorandum in support of his motion (ECF 782), along with additional exhibits. I shall refer to ECF 718 and 782 collectively as the "Motion."

The government opposes the Motion. ECF 799. Defendant replied. ECF 810.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall deny the Motion.

**I. Background**

On March 22, 2018, a grand jury in the District of Maryland returned a ten-count superseding indictment against defendant and eighteen others (ECF 157). Defendant was charged with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. § 846 (Count One). Carter entered a plea of guilty as to Count One on September 11, 2018 (ECF 268), pursuant to a Plea Agreement. ECF 214. The offense carries a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment.

*See id.* ¶ 3.

The Plea Agreement included a stipulation of facts. *Id.* at 3. According to the stipulation, defendant was a member of the drug distribution ring known as the "Good Pussy heroin shop." *Id.* at 4. From March 2017 to January 2018, defendant conspired with others "to obtain wholesale quantities of heroin and distribute . . . that heroin at the street-level." *Id.* at 3-4. Using pole cameras, Drug Enforcement Administration investigators captured video evidence of Carter's participation in drug trafficking, including footage of Carter and his co-conspirators "holding packs of heroin" and "provid[ing] customers with heroin" on "an almost daily basis" during the relevant period. *Id.* at 4. In addition, through wiretaps, defendant was heard "coordinat[ing] shop operations." *Id.*

In the Plea Agreement, the parties agreed that defendant qualified as a career offender under U.S.S.G. § 4B1.1(b). *See* ECF 214, ¶ 6(b). They also agreed that defendant had a Criminal History Category of VI. *Id.* The government agreed to recommend a reasonable sentence. *Id.* ¶ 8.

Sentencing was held on September 11, 2018. ECF 267. The Court determined that defendant did not qualify as a career offender. *See* ECF 269 (Statement of Reasons); ECF 249 (original Presentence Investigation Report), ¶ 18; ECF 270 (Amended Presentence Report, "Amended PSR").

According to the Amended PSR, defendant was forty-six years old. *Id.* at 3. Carter reported that in 2006 he was hospitalized after being diagnosed with congestive heart failure. *Id.* ¶ 65. In addition, he was hospitalized for three days in December 2008, and received treatment for "congestive heart failure exacerbation," among other things. *Id.* As of that time, defendant was also experiencing acute renal failure. *Id.* At the time of sentencing, Carter was prescribed

2

medication for high blood pressure, but not for heart failure. *Id.* ¶ 66.

As to substance abuse, Carter reported that in 2016 he resumed smoking crack cocaine after abstaining for ten years. *Id.* ¶ 71. From that point through the end of 2017, he used cocaine two or three times per week. *Id.* And, for a period of time leading up to the date of his arrest in this case, defendant used heroin on a daily basis. *Id.*

The Amended PSR reflected a final offense level of 27. *Id.* ¶ 21. Carter had sixteen criminal history points, resulting in a Criminal History Category of VI. *Id.* ¶ 41. As noted, the offense carried a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment. *See* 21 U.S.C. §§ 846, 841(b)(1)(A); ECF 270, ¶ 82. Carter's advisory sentencing guidelines ("Guidelines") called for a sentence ranging between 130 and 162 months of imprisonment. *Id.* ¶ 83.

According to the Amended PSR, Carter has an extensive history of drug convictions in State court. Several of those convictions involved drug possession. *See id.* ¶¶ 24-26, 30-32, 35, 37. But, others concerned drug distribution. In September 2009, defendant pleaded guilty to multiple charges of attempted distribution of heroin and was sentenced to concurrent terms of two years of incarceration. *Id.* ¶¶ 33, 35, 36. And, in 2016, defendant pleaded guilty to conspiracy to possess heroin with intent to distribute, for which he was sentenced to four years' imprisonment, with all but one day suspended, and eighteen months of probation. *Id.* ¶ 38.[1]

At sentencing, the Court imposed a sentence of 120 months' imprisonment, with credit for time served in federal custody, dating from January 17, 2018. ECF 268 at 2. Defendant has served approximately thirty-five percent of his sentence. He has a projected release date of September 19, 2026. ECF 782 at 2; *see Find an inmate*, FEDERAL BUREAU OF PRISONS,

---

[1] The State offense in ¶ 38 of ECF 270 is related to the underlying federal offense.

https://www.bop.gov/inmateloc/ (last visited January 18, 2021).

Carter is currently serving his sentence at FCI Cumberland, which is a medium-security institution. While incarcerated, defendant has not incurred any disciplinary infractions and has participated in multiple rehabilitation programs. ECF 782 at 9. Presently, defendant works in the prison bakery, which defense counsel characterizes as a "'plum' assignment for inmates," which "[m]alcontent inmates do not receive." *Id.* at 9 n.7.

Carter submitted a request for compassionate release to the Warden on June 1, 2020. ECF 782-1. The request was promptly denied. *Id.*

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence. Section 3582 was adopted as part of the Sentencing Reform Act of 1984. It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

4

However, for many years the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA"). *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020). As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the

5

defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release. *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018. *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

6

(A) **Medical Condition of the Defendant**.—

(i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence. Application Note 1(C) concerns Family Circumstances. Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205. However, the Court may not rely on the Program Statement. Rather, the Court must consider the Sentencing Commission's policy statements. *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t)

7

(directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"). However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act. Thus, it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406,

8

at *3 (W.D. Va. Apr. 2, 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020). But, compassionate release is a "rare" remedy. *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.  COVID-19[2]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[3] The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

---

[2] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[3] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). The pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393, (6th Cir. 2020). Indeed, for a significant period of time, life as we have known it came to a halt. Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. To be sure, many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 2020 WL 2556496, at *1 (citation omitted). As of January 21, 2021, COVID-19 has infected more than 24.5 million Americans and caused nearly 409,000 deaths in this country. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Jan. 18, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus. But, the country has recently seen the rollout of two vaccines for COVID-19 (Pfizer and Moderna). The vaccines initially were made available to health care workers and the elderly in

nursing homes, but the category of eligible persons has expanded recently. Nevertheless, the rollout has not been as expeditious as had been hoped.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) is "align[ed] with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, prisoners at heightened risk receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. According to a press release dated January 15, 2021, the BOP has administered 17,189 vaccine doses to staff and inmates at sixty-eight BOP institutions. *Update on COVID-19 Vaccinations*, U.S. DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF PRISONS (Jan. 15, 2021), https://www.bop.gov/resources/news/pdfs/20210115_press_release_vaccination.pdf (last accessed January 19, 2021). As of January 15, 2021, 1,027 staff and 1,051 inmates have received a series of two doses. *Id.*

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that increase the chance of severe illness. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019*

11

*(COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on November 2, 2020, to reflect the most recently available data, the CDC again revised its guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.  According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; COPD; being immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart conditions, including heart failure and coronary artery disease; sickle cell disease; smoking; pregnancy; and Type 2 diabetes. *Id.*  The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2.

Prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19. The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, the Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[4] As of January 21, 2021, the BOP had 122,913 federal inmates and 36,000 staff. And, as of the same date, the BOP

---

[4] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*,

14

reported that 3,561 inmates and 1,991 BOP staff currently tested positive for COVID-19; 41,043 inmates and 3,910 staff have recovered from the virus; and 202 inmates and three staff members have died from the virus. Moreover, the BOP has completed 99,620 COVID-19 tests. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 21, 2021). *See COVID-19*, FED. BUREAU OF PRISONS, https://bit.ly/2XeiYH1.

With respect to FCI Cumberland, where the defendant is a prisoner, as of January 21, 2021, the BOP reported that 128 inmates and ten staff have tested positive for COVID-19 and 246 inmates and 40 staff have recovered at the facility. And, the facility has completed 959 tests. There have been no reported deaths. *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 21, 2021).

### IV. Discussion

Carter, now forty-eight years of age, has moved for compassionate release on the ground that his health conditions render him particularly vulnerable to COVID-19. *See* ECF 782 at 5-8. In particular, defendant avers that he suffers from congestive heart failure and acute renal failure, each a risk factor for COVID-19 identified by the CDC. *See id.* In addition, Carter notes that he is prescribed medication for hypertension, which the CDC classifies as a condition that "might" increase the risk of complications due to COVID-19. *Id.* at 7. Moreover, defendant contends that

---

N.Y. TIMES (Oct. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

he is not a danger to the community and that the factors under 18 U.S.C. § 3553(a) favor his release. *Id.* at 8-10.

The government opposes Carter's Motion at each step of the analysis. The government contends that documentation of defendant's congestive heart failure and acute renal failure are lacking, and that hypertension does not qualify as an extraordinary and compelling reason for release in light of CDC guidance. ECF 799 at 62. Moreover, the government maintains that Carter is a danger to the public and that the § 3553(a) factors militate against a reduction of his sentence. *Id*. at 18-21.

### A. Extraordinary and Compelling Reasons

As noted, the Amended PSR reflects that as of 2008, Carter was diagnosed with congestive heart failure and acute renal failure. He has submitted medical records from his hospitalization in 2008 as evidence of those diagnoses. *See* ECF 782-2 at 2. Upon defendant's discharge from the hospital in 2008, he was prescribed Lasix, Norvasc, and Toprol-XL, among other medications. ECF 782 at 6. Defendant explains that those medications are "prescribed respectively for congestive heart failure, angina, and hypertension." ECF 782 at 6. The records also indicate that defendant had been hospitalized in 2006 due to his heart condition. *Id.*

Curiously, Carter's BOP medical records make no mention of a heart or kidney condition. *See id.;* ECF 782-4. Carter asserts that he "alerted BOP medical staff about his heart and kidney issues at least a year ago," and that he does not know why his BOP records do not reflect these conditions. EF 782 at 7 n.4. The Motion states, *id.* at 6:

> Undersigned counsel is troubled by the discrepancy between Carter's health history as stated in the PSR and Sinai Hospital records, Exhibit B, compared to his medical history as written in BOP records. Clearly, Carter's congestive heart failure and poor kidney health did not magically disappear upon his entrance to the BOP. For reasons unknown, the BOP medical records make no mention of Carter's preexisting heart and kidney issues.

16

The government "does not dispute the hospital discharge summary" submitted by Carter shows that he suffered from congestive heart failure and acute renal failure. ECF 799 at 16. But, according to the government, these records show that Carter suffered from these conditions twelve years ago. *Id.* Without more, the government essentially contends that the evidence submitted by defendant does not establish that his heart and kidney health issues render him particularly vulnerable to COVID-19. *See id.* Moreover, the government disputes that defendant's hypertension constitutes an extraordinary and compelling basis for relief. *Id.*

Numerous courts have found that, in light of the COVID-19 pandemic, hypertension, along with other conditions, qualifies as a compelling reason for compassionate release. *See, e.g., United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *see also, e.g., United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity constituted an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason). *But see United States v. Wright*, Nos. TDC-17-388, TDC-19-35, 2020 WL 2571198, at *3 (D. Md. May 21, 2020) (denying

17

compassionate release to defendant with diabetes, hypertension, chronic kidney disease, asthma, and obesity); *United States v. Barringer*, PJM-13-0129, 2020 WL 2557035, at *4 (D. Md. May 19, 2020) (denying compassionate release to defendant with hypertension, diabetes, chronic kidney disease, and extreme obesity).

Accordingly, I am satisfied that Carter satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

### B.  Sections 3142(g) and 3553(a)

Satisfaction of the "extraordinary and compelling" prong does not end the inquiry.  Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).  To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

In addition, the Court must consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Carter underscores that his offense "did not involve allegations of violence." ECF 782 at 8. Moreover, defendant notes that none of his prior convictions involved violence. *Id.* at 9. Rather, his record "is indicative of a long-time heroin user who lived hand-to-mouth, distributing heroin

18

to feed his own habit." *Id.* Moreover, Carter asserts that his participation in multiple rehabilitation programs while incarcerated and his infraction-free record demonstrate his commitment to self-improvement. *Id.*

The government urges the conclusion that, if released, Carter "might again engage in drug trafficking." ECF 799 at 20. In support, the government emphasizes the nature and circumstances of the underlying offense as well as defendant's criminal history. The government observes that defendant has three previous State-court convictions implicating heroin distribution. *Id.* Moreover, the government asserts that heroin distribution in Baltimore "contributes to the overall gun violence that plagues" the city. *Id.* at 19.

Defendant was involved in a drug trafficking organization, and the distribution of one kilogram of heroin was foreseeable to him. ECF 214, ¶ 6. I agree with the government that the nature of Carter's offense weighs heavily here.

In addition, the Amended PSR reflects fourteen prior convictions between 1996 and 2016. *See* ECF 270, ¶¶ 24-38.[5] The criminal justice system was consistently lenient with the defendant; he frequently received suspended sentences or short sentences. *See, e.g.*, *id.* ¶¶ 24-28, 31-32, 37-38. Paragraphs 33, 35, and 36 of the Amended PSR reflect the imposition of concurrent two-year sentences for drug offenses, and this was the longest sentence the defendant ever received. And, in the State system, there is parole, so the defendant did not serve the full two years. Yet, defendant continued down the wrong path.

To be sure, Carter deserves commendation for his investment in rehabilitation and his productive contributions by way of prison work. But, Carter has served only about thirty-five percent of his sentence for a serious offense.

---

[5] Not all prior offenses scored points.

Given the facts of the offense, coupled with the defendant's prior criminal history and the abbreviated time that defendant has been incarcerated, the Court concludes that release under 18 U.S.C. § 3582(c)(1)(A) is not warranted at this time.

## V.  Conclusion

For the forgoing reasons, I shall deny the Motion (ECF 718, EF 782), without prejudice. This determination is not intended to have any bearing on a decision of the BOP concerning release on home confinement.

An Order follows, consistent with this Memorandum Opinion.

Date:   January 22, 2021                                /s/
                                                Ellen Lipton Hollander
                                                United States District Judge